[No. G045369. Fourth Dist., Div. Three. Sept. 20, 2011.]

EARL L. et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties in Interest.

1494

## Counsel

J. Michael Hughes, under appointment by the Court of Appeal, for Petitioner Earl L.

Deborah A. Kwast, Public Defender, Michael Hill, Assistant Public Defender, Joseph Flohr and Dennis Nolan, Deputy Public Defenders, for Petitioner Kellie N.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Karen S. Cianfrani for Real Party in Interest C.L.

## Opinion

**ARONSON, Acting P. J.**—Earl L. (father) petitions for extraordinary writ relief challenging the juvenile court's order setting a selection and implementation hearing (Welf. & Inst. Code, § 366.26; all further statutory references are to this code unless otherwise noted) for his son C.L. Kellie N. (mother) joins father's petition. Father, incarcerated during the pendency of the case, contends the juvenile court erred when it terminated reunification services at the 18-month permanency review despite finding the Orange County Social Services Agency (SSA) provided inadequate reunification services during the most recent review period. For the reasons provided below, we deny father's writ petition and his request for a stay of the section 366.26 hearing, currently scheduled for October 5, 2011.

### I

### Factual and Procedural Background

On December 3, 2009, mother reported father physically assaulted her in their residence and that she received treatment at a hospital for minor injuries to her arm and shoulder. Westminster police officers determined she was too intoxicated to care for C.L., who was in the home when the assault occurred, and took him into protective custody. Mother's record included a string of alcohol-related convictions and probation violations. In 2004, mother was convicted of child endangerment and battery, and subsequently lost custody

of an older son. At the time of the present incident, mother was on probation for driving under the influence of alcohol and prohibited from drinking. Mother had failed to successfully complete several alcohol treatment programs. Investigating officers took both parents into custody. Father had suffered previous convictions for vandalism, driving under the influence, and spousal battery. At the time of the current incident, he was on probation for a 2007 spousal battery conviction. (Pen. Code, § 273.5.)

SSA filed a petition alleging C.L. came within the jurisdiction of the juvenile court (§ 300, subd. (b)) because of domestic violence and his parents' history of alcohol abuse. SSA initially placed C.L. with the paternal grandmother. At the detention hearing on December 8, the juvenile court ordered SSA to provide immediate reunification services. The social worker discussed with the parents a pamphlet entitled "Parent's Guide to Dependency Proceedings." In late December, the social worker gave the parents a parenting manual and instructed them to complete written exercises and return them in postage paid envelopes. The worker also provided "12 step" information and exercises.

In early January 2010, mother pleaded no contest to the amended petition, which now characterized the triggering incident as an "episode of domestic discord." Father submitted on SSA's report. The juvenile court ordered reunification services for both parents. Father's case plan required participation in a domestic violence program and counseling, parenting education, and substance abuse testing. The case plan directed father to learn whether he could obtain reunification services while incarcerated. The case plan authorized weekly parental visits with C.L. during their local incarceration. SSA placed C.L. with foster parents in mid-January 2010 after the paternal grandmother informed SSA she could no longer care for him.

The social worker reported for the six-month review that father remained incarcerated at Theo Lacy Facility, but expected an imminent transfer to a state prison. SSA and the parties characterized father's progress toward alleviating or mitigating the causes necessitating placement as "minimal." He had not signed the case plan. He was incarcerated during the "recent supervisory period but did sign up for parenting classes offered at his current facility. As per the previously assigned social worker, reading/study materials regarding parenting were given to the child's father as well." Father was "usually seen once each week" by another social worker, who brought C.L. to visit.

Mother had signed the case plan and the social worker deemed her progress "moderate." Once out of custody, she participated in case plan activities, including the third phase of the county's perinatal substance abuse

program, and had completed a 10-week personal empowerment program. Alcohol and drug testing results proved negative. Mother had twice-weekly two-hour visits. The social worker expressed some concern mother was not "utilizing the full visitation time" and stated mother needed to "focus more on comforting, entertaining and nurturing" C.L. during the visits.

The social worker recommended continuing reunification services for mother with an "enhancement plan" for father.[1] The social worker wrote she would "monitor the parents' cooperation and compliance with the Court approved case plan by contacting the father's service-providing agencies to obtain information regarding . . . progress." The worker recommended scheduling a 12-month review.

At the six-month review in June 2010, the parties stipulated, and the juvenile court found, a substantial risk existed in returning C.L. to the custody of his parents, and that SSA had offered or provided the parents with reasonable services. The trial court amended the case plan to provide mother with eight hours of monitored visitation per week, and a monthly visit for father in prison. The court scheduled a 12-month review for December 27, 2010. The court's minute order provided it approved and incorporated the June 24 case plan, but did not specifically reference a change to an "enhancement plan" for father.

In July 2010, father was transferred to a prison in Wasco. SSA reported he had at least two years remaining on his sentence for domestic violence. Unfortunately, around the Fourth of July, mother relapsed. She tested positive for alcohol, missed several tests and perinatal classes, and missed several visits with C.L. She was directed to repeat the second phase of the perinatal program.

In an interim report dated July 26, the social worker described mother's relapse, and recommended the child "remain in his current placement under a Family Reunification services plan . . . ." The worker again recommended father "be given an enhancement plan for the purpose of continuing to focus on the needs of his child during the remainder of his incarceration." During a July meeting with the social worker, mother asked about father's parental status and who would gain custody of C.L., "an oft-repeated theme . . . as she worries that she may not be able to succeed in reunification but that she wants to make sure that the court and agency do not take away the child's father's rights." The social worker encouraged her to focus on resolving her

---

[1] Enhancement services are child welfare services offered to the parent not retaining custody, designed to enhance the child's relationship with that parent. (See *In re A.C.* (2008) 169 Cal.App.4th 636, 642, fn. 5 [88 Cal.Rptr.3d 1]; see also *In re A.L.* (2010) 188 Cal.App.4th 138, 142, fn. 2 [115 Cal.Rptr.3d 560].)

own issues and to allow father "who is a grown man, to take responsibility for his situation." The court referred mother to a health care agency for a prescription to obtain Antabuse.

In August, mother pleaded guilty to driving under the influence. The criminal court placed her on probation and ordered her to serve 30 days in custody.

The court ordered authorities to transport father for a progress review hearing in September and for the 12-month review in December. The orders were subsequently rescinded after the sheriff's department reported father elected not to attend the hearings.

In early October, SSA reported mother had been cited for driving on a suspended license. Mother stated she was attending 12-step meetings, but could not reenroll in the perinatal program for four to six weeks. A perinatal therapist suggested mother consider a residential or different outpatient program with a shorter waiting list. Mother's friend and employer, who monitored visits, reported in late September she suspected mother continued to drink. She described mother as unstable, with a negative outlook, who blamed everyone but herself for her problems. SSA changed the location of visits to Orangewood Children's Home. SSA denied mother two visits in late September after determining she was under the influence.

SSA recommended termination of reunification services in advance of the 12-month review. The social worker characterized both parents' cooperation and progress with the case plan as minimal. Mother had been incarcerated on three occasions since July 2010, and remained in jail until December 16th of that year. C.L. visited his mother weekly, but became fussy and lost interest after 15 to 20 minutes, telling the foster father, " 'Go, go.' " The social worker lamented she "had hoped to see this mother anchor her sobriety with positive support systems that would assist her development toward being a parent . . . [but t]hat hope has not been supported . . . [and] the child [cannot] put off his needs while waiting for his parent to become someone who [can] adequately care for him."

Observing two years remained on father's sentence, the worker noted he "will not be able to make his own decisions as to his needs and/or child's needs until he has completed his sentence, is released from prison . . . and is able to complete his Juvenile Court ordered case plan objectives." As he had "a fairly lengthy time yet to serve in prison," the social worker concluded "[t]his would seem to be outside the realm of a reasonable reunification time line between father and child."

C.L. had moved forward and "accomplished the necessary early childhood developmental task of attaching to the persons (his current foster parents)

who can meet his needs for optimal growth, health, emotional stability and his physical needs for a safe, predictable environment."

At the 12-month review hearing in January 2011, the parties stipulated to continue reunification services until an 18-month review. The stipulation provided SSA had offered or provided reasonable services to the parents. The stipulation asked the court to approve the case and visitation plan contained in SSA's *June 2010 six-month review report*, and to adopt SSA's recommendation in that report, which requested the court to order enhancement rather than reunification services for father. The court continued the case for an 18-month review after making the requested findings. The court ordered authorities to transport father from prison in Wasco to court for the 18-month review.

The order for father to attend the 18-month review was returned as undeliverable in February 2011. In March, SSA requested a change in the court's order (§ 388) requiring monthly visits with father. C.L. had not seen his father since authorities transferred him to state prison. SSA arranged for C.L. to visit father in a Blythe area prison on March 12, 2011. Father showed affection and attention to C.L., but the social worker described 22-month-old C.L.'s adverse emotional and physical reaction to the 425-mile, eight-hour round trip journey. C.L. was uncomfortable and fussy during the drive, and the foster parents reported he did not sleep well for several days after the trip.

In a status review report filed in late May 2011, the social worker reported mother graduated in March from the residential treatment program, but was arrested for public intoxication four days later. She was currently serving a four-month jail sentence. Mother now conceded, "Maybe [C.L.] does need to stay with [the foster parents]. His little life shouldn't be troubled like this . . . . [Father] is upset with me. I think he was depending on me, sort of riding on my coat tails." The social worker wrote "to the undersigned's knowledge [father] has not participated in programs at [his current prison] that would allow him to address his part in the issues that brought the child to the attention of the Court. He will not be able to make his own decisions as to his needs and/or his child's needs until he has completed his sentence, is released from . . . prison (as per father, may have another one and one-half years to serve) and is able to complete his Juvenile Court ordered plan objectives."

An addendum report dated June 6, 2011, described C.L.'s visits with father in April and May 2011. Father was again affectionate and attentive, and C.L. seemed to enjoy himself. During the May trip, a paternal relative rode with C.L. in the backseat, which made the drive more comfortable for C.L. The foster parents reported C.L. had difficulty sleeping for two nights

following the visit. In the same report, the social worker stated she learned father had been transferred to the Blythe prison on January 24, 2011. Visits commenced in March "[o]nce clearances for the transporters were received" from the prison. A fourth visit was planned for June 2011 while father was in Orange County to attend the 18-month review. Apparently, the social worker was unaware father had notified the court he would not attend the June hearing.

At the June 7, 2011, 18-month review hearing, the social worker testified she had not communicated with father or contacted prison officials to determine what programs were available to him, nor had SSA provided other services to father, beyond the three recent prison visits with C.L. She believed father was currently in a drug rehabilitation program.

Mother testified she was currently in custody and expected to be released in July. She planned to enter a sober living home and seek support through Alcoholics Anonymous. She acknowledged several failed attempts at sobriety over the previous 18 months and that it was not fair to C.L. to "wait until [she got] it right." Her longest period of sobriety had been a little over a year, during her pregnancy with C.L.

The juvenile court determined father had not been provided reasonable reunification services during the current reporting period, rejecting SSA's argument the court had modified father's reunification plan to enhancement services at the 12-month review. But the court declined to extend the reunification period (§ 366.22, subd. (b)), finding reasonable services had been provided over the "history of the case." The court noted there was not the "smallest chance" father would benefit from additional reunification services, noting he had done nothing "to have attention called to the fact that he was not receiving services." The court found return of C.L. to his parents' custody would be detrimental, terminated reunification services, and set a section 366.26 hearing for October 5, 2011. The court continued visitation.

II

DISCUSSION

*The Juvenile Court Did Not Err by Failing to Extend Reunification Services Beyond the 18-month Review and Setting a Section 366.26 Hearing*

Father contends the juvenile court erred when it failed to extend family reunification services beyond the 18-month permanency review after finding

SSA failed to provide him with reasonable reunification services during the current reporting period (Jan. to June 2011).[2] As explained below, the challenge fails.

■ Family preservation is the priority when dependency proceedings commence. (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1472 [50 Cal.Rptr.2d 385].) "Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.' [Citation.]" (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 [42 Cal.Rptr.2d 200] (*Elizabeth R.*).) Therefore, reasonable reunification services must usually be offered to a parent. (*Ibid.*) SSA must make a " ' "good faith effort" ' " to provide reasonable services responsive to the unique needs of each family. (*Precious J., supra*, at p. 1472.) "[T]he plan must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. [Citation.]" (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777 [8 Cal.Rptr.2d 416].) An effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success. (*Elizabeth R., supra*, at p. 1790.) The adequacy of SSA's efforts to provide suitable services is judged according to the circumstances of the particular case. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362 [52 Cal.Rptr.2d 474].) "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414 [286 Cal.Rptr. 592], original italics.)

■ With an incarcerated parent, reunification services must be provided "unless the court determines, by clear and convincing evidence, those services would be detrimental to the child." (§ 361.5, subd. (e)(1); see *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1406 [22 Cal.Rptr.2d 50].)[3] "In determining the content of reasonable services, the court shall consider the particular barriers to an incarcerated or otherwise institutionalized parent's access to those court-mandated services and ability to maintain contact with his or her child, and shall document this information in the child's case plan. Reunification services are subject to the applicable time limitations imposed

---

[2] As noted earlier, mother joins in father's petition to the extent his claims inure to her benefit, and she filed a reply to real parties in interest's responses to the petition.

[3] The court did not make a finding of detriment in this case. In determining detriment, the court is required to "consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime . . . , the degree of detriment to the child if services are not offered . . . , the likelihood of the parent's discharge from incarceration . . . within the reunification time limitations described in subdivision (a), and any other appropriate factors." (§ 361.5, subd. (e)(1).)

in subdivision (a). Services may include, but shall not be limited to, all of the following: [¶] (A) Maintaining contact between the parent and child through collect telephone calls. [¶] (B) Transportation services, where appropriate. [¶] (C) Visitation services, where appropriate. [¶] (D) Reasonable services to extended family members or foster parents providing care for the child if the services are not detrimental to the child. [¶] ■ An incarcerated parent may be required to attend counseling, parenting classes, or vocational training programs as part of the reunification service plan if actual access to these services is provided. The social worker shall document in the child's case plan the particular barriers to an incarcerated or institutionalized parent's access to those court-mandated services and ability to maintain contact with his or her child." (§ 361.5, subd. (e)(1).)

■ SSA must identify the services available to an incarcerated parent. (*In re Monica C.* (1994) 31 Cal.App.4th 296, 307 [36 Cal.Rptr.2d 910] (*Monica C.*).) SSA cannot delegate to an incarcerated parent the responsibility for identifying those services (*id.* at pp. 307–308), and may not simply conclude that reunification efforts are not feasible on the sole ground the parent is incarcerated (*Elizabeth R., supra*, 35 Cal.App.4th at pp. 1791–1792).

The social worker testified at the 18-month review hearing that she had not maintained contact with father or prison officials to determine what programs were available, and did not provide other services to father. The juvenile court determined it could not find SSA provided or offered reasonable reunification services to father between January and June 2011. But the court found services "overall" were reasonable, and it was not in C.L.'s best interests to extend the reunification period. The court noted father failed to alert social services or his attorney that he was not receiving services.

■ Section 366.22 provides that when, as here, a case has been continued beyond the 12-month review (§ 366.21, subd. (g)(1)), "the [18-month] permanency review hearing shall occur within 18 months after the date the child was originally removed from the physical custody of his or her parent or legal guardian." (§ 366.22, subd. (a).) Section 366.22, subdivision (a), further provides that at the 18-month permanency review, "[u]nless the conditions in subdivision (b) are met and the child is not returned to a parent or legal guardian at the permanency review hearing, the court *shall* order that a hearing be held pursuant to Section 366.26 . . . ." (Italics added.)

■ Subdivision (b) of section 366.22 provides the juvenile court may continue the case for up to six months if the "court determines by clear and convincing evidence that *the best interests of the child would be met by the provision of additional reunification services to a parent or legal guardian who is making significant and consistent progress in a court-ordered residential substance abuse treatment program, or a parent recently discharged from*

*incarceration or institutionalization and making significant and consistent progress in establishing a safe home for the child's return . . . .*" (Italics added.)

■ Subdivision (b) of section 366.22 specifies the "court shall continue the case only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian."

■ To find a substantial probability the child will be returned to a parent or guardian, the court must find: "(1) That the parent or legal guardian has consistently and regularly contacted and visited with the child. [¶] (2) That the parent or legal guardian has made significant and consistent progress in the prior 18 months in resolving problems that led to the child's removal from the home. [¶] (3) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her substance abuse treatment plan as evidenced by reports from a substance abuse provider as applicable, or complete a treatment plan postdischarge from incarceration or institutionalization, and to provide for the child's safety, protection, physical and emotional well-being, and special needs. [¶] For purposes of this subdivision, the court's decision to continue the case based on a finding or substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian is a compelling reason for determining that a hearing held pursuant to Section 366.26 is not in the best interests of the child. [¶] The court shall inform the parent or legal guardian that if the child cannot be returned home by the subsequent permanency review hearing, a proceeding pursuant to Section 366.26 may be instituted. *The court may not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian.*" (§ 366.22, subd. (b)(1)–(3), italics added.)

Relying on the italicized language quoted immediately above, the parents contend the juvenile court erred by ordering a hearing under section 366.26 because it did not find clear and convincing evidence that reasonable services had been provided or offered to father during the current review period.

The juvenile court interpreted section 366.22, subdivision (b), as requiring "an overall finding . . . that's based on the history of the case. Not a finding that's based on the last six months." The court noted the parties stipulated, and the court found, at the six- and 12-month review hearings that reasonable services had been provided.

SSA argues the juvenile court's interpretation comports with the plain language of section 366.22 and the overall goals of the dependency scheme.

It also contends any error is harmless because father faced incarceration beyond any extended reunification period and "a more favorable result was not reasonably probable for Father . . . had he been provided with sufficient services during the six-month period in question."

Section 366.22 was amended effective in 2009. Prior case law held that while the juvenile court must make a finding regarding reasonable services at the 18-month permanency review hearing, "the authority of the juvenile court to set a section 366.26 hearing is *not* conditioned on a reasonable services finding." (*Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1511–1512 [33 Cal.Rptr.3d 89], original italics; see *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1015–1016 [70 Cal.Rptr.2d 603] (*Mark N.*) [§ 366.22 does not give the juvenile court the option to continue reunification services nor does it specifically prohibit court from ordering § 366.26 hearing even if it finds reasonable reunification services have not been provided].)

█ Under the 2009 amendment to section 366.22, the juvenile court now has "the option at the [18-month] permanency review hearing, *in certain limited circumstances*, to continue the matter . . . for a parent who is making 'significant and consistent progress' in a substance abuse treatment program, or who has been recently released from institutionalization or incarceration and is making 'significant and consistent progress' in establishing a home that is safe for the child to return to. *For such individuals*, services can be continued . . . if the extension of services is in the best interests of the child and there is a substantial probability that the child will be returned [citation]. Furthermore, services for *such individuals* must be continued if there is a finding that reasonable services have not been provided [citation]. Furthermore, *for such individuals*, the court may not set a hearing pursuant to . . . [s]ection 366.26 unless there is clear and convincing evidence that reasonable services have been provided [citation]." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2011) Periodic Review Procedures, § 2.154[2][c], p. 2-443, italics added.)

We disagree with father that setting a section 366.26 hearing is "conditioned on a reasonable services finding" at the section 366.22 hearing covering the most recent reporting period. Subdivision (b) provides a limited right to a continuance where additional reunification services would serve the child's best interests, and the parent is making "significant and consistent progress" in treatment programs or in establishing a safe home after release from custody. In these cases, the juvenile court may not set a section 366.26 hearing if the court finds reasonable reunification services have not been offered or provided.

Here, neither parent made "significant and consistent" progress. Indeed, father made only "minimal" progress by both the six- and 12-month review

hearings. A spectral presence in this case, father did not sign the case plan, declined to attend review hearings, and made no effort to alert his appointed counsel to any issues concerning reunification services. As mother noted, he elected to ride her coattails, a gambit that ultimately did not pay off. As C.L.'s lawyer argued in the juvenile court, "neither parent has stepped up to the plate or done anything to become a parent. What's more bothersome in this case, which would have been a six-month-review case, is it appears . . . dad wasn't even interested. He was counting on mom, . . . he sat on his rights."

 "A noncustodial parent may not refuse to participate in reunification treatment programs until the final reunification review hearing has been set and then demand an extension of the reunification period to complete the required programs. [Citations.] Neither may a parent wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing." (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1092–1093 [70 Cal.Rptr.2d 658] (*LA County DCFS*) [the father demonstrated no regular or serious effort to visit the minor until the mother died and did not contact his appointed trial counsel to seek visitation; the appellate court noted it was not the agency's responsibility to take the parent by the hand to ensure he maintained regular visitation].)

 It defies common sense to continue reunification efforts for a parent who has made minimal efforts throughout a case. There is no probability the court would return the child to the physical custody of this parent within the extended period of time (24 months). As the juvenile court found here, there was not the "smallest chance" father would benefit from additional reunification services. Accordingly, the juvenile court did not err in declining to continue the hearing under section 366.22, subdivision (b).

Father states California Rules of Court, rule 5.708(m) "supports the proposition that a trial court cannot set a Section 366.26 hearing unless the court makes a 'current' finding by clear and convincing evidence that reasonable services have been provided or offered to the parent." Rule 5.708(m) provides, "At any 6-month, 12-month, or 18-month hearing, the court may not set a hearing under section 366.26 unless the court finds by clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian." If the rule purports to prohibit the juvenile court from setting a section 366.26 hearing at the 18-month permanency hearing irrespective of whether a parent is making significant progress, it conflicts with section 366.22. Moreover, there is no dispute in this case SSA provided reasonable services to *mother*. Because of father's continuing

incarceration, mother was C.L.'s only parent who could regain custody within the extended reunification period.

Father faults the court for using a "balancing test to determine whether or not to extend" reunification services to father. The court stated it was disturbed that SSA did not provide services and "the court is at a loss as to what the proper remedy for that should be. Clearly, it is not the child who failed to offer those services. Clearly, it's not the child whose permanency and stability and life should be held in abeyance because the agency failed to live up to [its] obligation. I wish I had something that I could do. I don't know what it would be, but I don't see that it is in the child's best interest to offer a remedy which would extend out reunification services, especially for a parent who, during the last six months, failed, in any sense, to do anything to have attention called to the fact that he was not receiving services. So there is a balancing that goes on here." The court also stated "if there was even the smallest chance that the court believed that the father would, actually, benefit from services in the next six months, the court may have exercised its discretion based on, more or less, contract and equity law more than what I see in the code here to extend reunification services . . . . But frankly . . . I have no evidence that would lead me to believe . . . father would benefit from those services."

The court's comments track section 366.22. It found C.L.'s best interests would not be met by the provision of additional reunification services, impliedly because father had not made significant and consistent progress in the case.

Father also argues the court erred when it used a "quasi-waiver analysis when evaluating what actions the father took over the last reporting period. The [juvenile] court opined that the father failed to do anything to have attention called to the fact that he was not receiving services" and the "lack of action by the father seemed to justify the . . . court's decision not to extend [the] case to the [s]ection 366.25 hearing." Father cites cases, noted above, that a parent is not required to complain about the lack of services as a prerequisite to the department fulfilling its statutory obligation to provide reasonable reunification services to an incarcerated parent. (See *Elizabeth R., supra*, 35 Cal.App.4th at p. 1791; *Monica C., supra*, 31 Cal.App.4th 296, 307–308; *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1165–1166 [39 Cal.Rptr.2d 743].)

Here, the court did not find father waived the right to services by failing to request them. But as noted above, a parent may not obtain an extension of the reunification period under section 366.22 unless the parent is making significant and consistent progress in the case. A parent who stands silently on the

sidelines until the section 366.22 permanency review undermines the claim that significant progress has been made and therefore is in no position to demand an extension. (See *LA County DCFS, supra*, 60 Cal.App.4th at p. 1093.)

■■■ Father also states "[i]f a reasonable services finding is not required" to set a section 366.26 hearing, SSA "can ignore every incarcerated parent during the time between the" 12- and 18-month reviews. This is not true. Under section 366.22, subdivision (b), the court may not set a section 366.26 hearing if a parent shows significant and consistent progress as defined by that subdivision and the agency fails to provide or offer reasonable services between the 12- and 18-month reviews. Moreover, nothing prevents a parent or counsel from alerting the juvenile court of the inadequacy of ongoing services at any time.

Father also asserts the juvenile court "failed to consider" he was participating in a drug rehabilitation program in prison, and ignored his monthly visits with C.L. This information was contained in SSA's reports, and we must assume the court was aware of it. But father does not explain how this information would entitle him to an extension of the reunification period under section 366.22, subdivision (b).

Finally, father cites *Mark N., supra*, 60 Cal.App.4th 996, but that case is distinguishable. In *Mark N.*, no substantial evidence showed the social services agency offered or provided reasonable reunification services to the incarcerated father during *any* of the 17-month reunification period. The court noted section 366.22 did not (at that time) authorize the court to extend reunification services beyond the 18-month hearing. But the court also noted that section 366.26, subdivision (c)(2), precluded termination of parental rights when the agency failed to offer or provide reasonable reunification services to a parent *throughout the reunification period*, and found the juvenile court therefore has limited discretion under section 352[4] to continue the 18-month hearing.

Here, father does not argue SSA failed to offer or provide reasonable reunification services to the father during all or most of the reunification period. Father stipulated he had been provided with reasonable services at the six- and 12-month reviews. *Mark N.* therefore has no application here.

---

[4] Section 352, subdivision (a), provides in part: "[T]he court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor."

## III

### Disposition

The petition challenging the juvenile court's order setting the section 366.26 hearing is denied, as is the request to stay the hearing.

Fybel, J., and Ikola, J., concurred.